U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2013 SEP -3 P 4: 19

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:13-cr-25-01-PB |
| ) | |
| JAMES JOYCE ) | |
| ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John P. Kacavas, the United States Attorney for the District of New Hampshire, and the defendant, James Joyce, and the defendant's attorney, Jonathan Saxe, Esquire, enter into the following Plea Agreement:

1. <u>The Plea and The Offense</u>.

The defendant agrees plead guilty to Count One of an Indictment charging him with conspiracy to manufacture five grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, and 841(b)(1)(B)(viii).

In exchange for the defendant's guilty plea, the United States agrees to dismiss Count Two of the Indictment at the time of sentencing. The United States further agrees to the sentencing stipulations identified in section 6 of this agreement.

2. <u>The Statute and Elements of the Offense</u>.

21 U.S.C. § 841(a)(1) provides, in pertinent part:

(a) Unlawful acts

-1-

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally–

**(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

See 21 U.S.C. § 841(a)(1) (West 2013).

21 U.S.C. § 846, provides, in pertinent part:

> [a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

See 21 U.S.C. §§ 846, 841(a)(1)(West 2013).

The defendant understands that the offense contained in Count One of the Indictment has the following four (4) elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

First, A conspiracy involving two or more persons must have existed to commit the offense charged in Count One the Indictment, that is, the unlawful manufacture of five grams or more of methamphetamine, its salts, isomers, and salts of its isomers;

Second, The defendant must have joined the conspiracy with knowledge of the existence of the conspiracy and its criminal objectives;

Third, The defendant must have knowingly, voluntarily and intentionally become a member of the conspiracy; and

Fourth, In joining the conspiracy, the defendant must have intended to achieve the unlawful objectives of the conspiracy.

3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove the following facts and those facts would establish the elements of the offenses beyond a reasonable doubt:

Beginning in and around May, 2012, the Tilton, New Hampshire Police Department began receiving information about a number of individuals who were believed to be manufacturing methamphetamine utilizing the "one pot" manufacturing method from a residence located at 262 Laconia Road, Tilton, New Hampshire. The owner of the residence was co-defendant Marie Chacon. Based on prior police contact, law enforcement knew that several small children resided at the residence.[1]

On October 29, 2012, a Tilton Police Department Confidential Informant (CI) informed police that the CI believed the defendant was manufacturing methamphetamine in Chacon's upstairs bedroom at the 262 Laconia Road residence.

On November 8, 2012, Tilton Police Detective Nathan Buffington assisted with a DCYF welfare check at the residence. As the detective went through the door, he met the defendant, who immediately turned away from the detective and went straight up to Chacon's bedroom, where he remained with the door shut for the duration of the visit. The following day, Det. Buffington returned to the residence for a report of a domestic incident. While there, a female, who was residing at the residence temporarily, asked the detective if he was going to search "Mama's" room for methamphetamine. "Mama" was subsequently identified as Chacon.

---

[1] From January 5, 2012 through August 31, 2012, the defendant was incarcerated at the New Hampshire State Prison for Men.

Pseudoephedrine purchase database checks reveals that from late-September, 2012 through early December, 2012, the defendant's co-defendants and other individuals made approximately twenty (20) retail purchases of cold medicines containing 2.4 grams of Pseudoephedrine for the defendant to be used in the "one pot" manufacturing process. Pseudoephedrine is a necessary precursor ingredient used in the "one pot" method of manufacturing.

On December 12, 2012, Det. Buffington applied for and was granted a State of New Hampshire "no knock" search warrant for the 262 Laconia Road residence. Later that day, the search was executed. Prior to the search, the police had received information from another cooperating individual that when the upstairs bedroom light was illuminated and the window open at the 262 Laconia Road residence, it was probable that a methamphetamine cook was occurring.

At 7:20 pm, Det. Buffington drove by the residence and noted the light on and window open, which, given the month, was suspicious. The search team made entry at 8:00 pm through the first floor where they immediately encountered co-defendants Hon Luu and Debra Miller.

As the team entered Chacon's second floor bedroom, they located an active "one pot" methamphetamine bottle wrapped in a heating pad on a night stand next to the bed. Chacon was on the bed approximately two feet from the lab. Seated with her on the bed and within four feet of the lab was Debra Miller's four year old son, who is also Chacon's grandson. Co-defendant Michael Caissie, Chacon's boyfriend, was also seated in a rocking chair at the end of the bed. Chacon asked what the police were doing there and they pointed to the lab. Asked several times who else was in the house, Chacon would not answer.

At the same time, police located a door secreted behind a hanging blanket adjacent to the bedroom with a locked door. As the door was locked, the police forced entry. The defendant and two other individuals were located in the room. As the police made entry, they observed a HCL gas generator in plain view. A HCL gas generator is a necessary piece of equipment used in the "one pot" method of methamphetamine manufacture.

As the Drug Enforcement's Clandestine Laboratory Response Team made entry into the residence as part of the search team, their ammonia detection devices on their protective suits alarmed. This was an indicator that the ammonia gas vapors in the air were at dangerously high levels. Ammonia gas is produced during the "one pot" cooking process and can reach dangerously high saturation levels, placing individuals in and around the "one pot" cook in substantial danger.

When the "one pot" bottle was removed from Chacon's bedroom by law enforcement, they found it was very close to exploding. Before it could so do, the bottle was brought outside where it was detonated by members of the New Hampshire State Police bomb squad, which produced a large explosion.

Subsequently, the house was processed for evidence. In addition to the HCL generator, the locked room where the defendant was located contained Sudafed blister packs, a Pyrex baking dish, several small bags of suspected methamphetamine powder, a hair dryer (used to speed up cooking process), and a large bag containing all of the ingredients needed to manufacture methamphetamine using the "one pot" method. Located in a trash can were stripped lithium batteries, empty containers of Morton salt, sodium hydroxide (drain cleaner), and coffee filters, again, all necessary "one pot" manufacturing ingredients. Subsequently, a quantity of

"finished" methamphetamine powder was located in the defendant's wallet.[2]

In Chacon's room, police located two glass pipes where Caissie had been seated, a box of baggies under the bed, and additional glass pipes on the night stand. On a dresser was a child's open yogurt container with a spoon in it next to several pipes, and coffee filters with white residue in them.[3]

Miller admitted that during the course of the conspiracy, she observed Joyce manufacture methamphetamine "three or four times" and stated that she had purchased pseudoephedrine for him to be utilized in the manufacture of methamphetamine. She also stated that she had been present with other co-defendants when they purchased pseudoephedrine to be utilized in the manufacture of methamphetamine. Miller stated that she had observed the defendant manufacturing methamphetamine in Chacon's bedroom.

4. <u>Penalties, Special Assessment and Restitution</u>.

The defendant understands that the penalties for the offenses are:

A.   A mandatory minimum term of imprisonment of five years (21 U.S.C.§ 841(b)(1)(B));

B.   A maximum fine of $2,000,000; and

---

[2] The substance found in Joyce's wallet was determined to be .35 grams of methamphetamine. The contents of the "one pot" lab, and the small plastic bags located during the search also tested positive for methamphetamine.

[3] The glass pipes tested positive for methamphetamine.

    C.    A term of supervised release of at least four years and not more than life. The defendant understands that the defendant's failure to comply with any conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. §3583).

The defendant also understands that he will be required to pay a special assessment of $100 at or before the time of sentencing; and that the Court may order him to pay restitution to the victims of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5. <u>Sentencing and Application of the Sentencing Guidelines</u>.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that he has no right to withdraw his guilty plea if the applicable advisory guideline range or his sentence is other than he anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

    A.    Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

    B.    Respond to questions from the Court;

    C.    Correct any inaccuracies in the pre-sentence report;

    D.    Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range with the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant have stipulated to the following:

    A.    The parties agree that they will jointly recommend that the court impose a sentence of 120 months, which they further agree is a reasonable and appropriate disposition in this case; and

This stipulation is intended by the parties to be "binding" under Fed. R. Crim. P. 11(c)(1)(C). By using the word "binding", the parties mean that if the Court cannot or will not accept the stipulation, either party will be permitted to withdraw from this Plea Agreement. The parties will not be allowed to withdraw from this Plea Agreement for any other reason.

7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

    A.    Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.    Challenges the United States' offer of proof at any time after the plea is entered;

C.    Denies involvement in the offense;

D.    Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.    Fails to give complete and accurate information about his financial status to the Probation Office;

F.    Obstructs or attempts to obstruct justice, prior to sentencing;

G.    Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.    Fails to appear in court as required;

I.    After signing this Plea Agreement, engages in additional criminal conduct; or

J.    Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the

United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. <u>Waiver of Trial Rights and Consequences of Plea</u>.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

A. To plead not guilty or to maintain that plea if it has already been made;

B. To be tried by a jury and, at that trial, to the assistance of counsel;

C. To confront and cross-examine witnesses;

D. Not to be compelled to provide testimony that may incriminate him; and

E. To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9. <u>Acknowledgment of Guilt; Voluntariness of Plea</u>.

The defendant understands and acknowledges that he:

Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

-10-

>   Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;
>
>   Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.  Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

E.  Is completely satisfied with the representation and advice received from his undersigned attorney.

10. <u>Scope of Agreement</u>.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11. <u>Collateral Consequences</u>.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the indictment in this case. The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13. <u>Waivers</u>.

A. Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel in the negotiation of this Plea Agreement or at the sentencing hearing.

B. Collateral Review

The defendants understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if that sentence is the stipulated sentence or within the stipulated sentencing range specified in section 6 of this agreement.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel in the negotiation of the Plea, Plea Agreement or the sentencing hearing. The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea

Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal s authorized by law.

14. No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN P. KACAVAS
United States Attorney

Date:					By:	*Jennifer C. Davis*
						Jennifer Cole Davis
						Assistant U.S. Attorney
						NH Bar Association # 10222
						53 Pleasant St., 4th Floor
						Concord, NH 03301
						Jennifer.c.davis@usdoj.gov


The defendant, James Joyce, certifies that he has read this 15-page Plea Agreement and that he fully understands and accepts its terms.

Date: 8-30-13				*James Joyce*
						James Joyce, Defendant


I have read and explained this 15-page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date: 8/30/13				*Jonathan Saxe*
						Jonathan Saxe, Esq.
						Attorney for James Joyce

–15–